UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MOHAMED A. KHALI

                    Plaintiff,                    CIVIL ACTION NO. 06-CV-12330-DT

          vs.                                     DISTRICT JUDGE AVERN COHN

COMMISSIONER OF                                   MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                    Defendant.
_____/


## I.   REPORT AND RECOMMENDATION

       This Court recommends that Defendant's Motion for Summary Judgment (Docket # 11)

be **DENIED**, that Plaintiff's Motion for Summary Judgment (Docket # 9) be **DENIED**, and that

the case be **REMANDED** for further proceedings consistent with this Report.

## II.   PROCEDURAL HISTORY

       This is an action for judicial review of the final decision by the Commissioner of Social

Security that the Plaintiff was not "disabled" for purposes of the Social Security Act.  42 U.S.C.

§§ 423, 1382.  The issue for review is whether the Commissioner's decision is supported by

substantial evidence.

       Plaintiff Mohamed Khali filed an application for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") on March 9, 2004.  (Tr. 66-68, 228-90).  He alleged

he had been disabled since February 1, 2004 due to chronic obstructive pulmonary disease,

kidney disease, and high blood pressure. *Id.* Plaintiff's claim was initially denied. (Tr. 50-54, 291-96). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 55-56). A hearing took place before ALJ Philip E. Moulaison on September 20, 2005. (Tr. 35-49). Plaintiff was represented by an attorney at the hearing. (Tr. 15-16, 35). The ALJ denied Plaintiff's claim in a written opinion issued on January 23, 2006. (Tr. 20-29). The Appeals Council denied review of the ALJ's decision on May 6, 2006 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 9-14, 297-305). Plaintiff appealed the denial of his claims to this Court, and both parties have filed motions for summary judgment.

III.   **MEDICAL HISTORY**

In September 1998 Plaintiff fractured two ribs and injured his left lung. He was hospitalized and subsequently underwent a thoracotomy.[1] Plaintiff remained in the hospital for more than a month and was released in stable condition. Plaintiff thereafter had follow-up appointments with his primary care physician. (Tr. 117- 131, 146-53).

In April 2004 Plaintiff was admitted into the hospital for a severe headache and severely high blood pressure. (Tr. 172-82). Plaintiff denied any chest pain or previous problems with his blood pressure. (Tr. 178). An electrocardiogram showed normal sinus rhythm, left atrial enlargement, and left ventricular hypertrophy with lateral wall T-wave

---

[1]      A "thoracotomy" is "[a]n incision into the chest wall." *Stedman's Medical Dictionary* 1806 (26th ed. 1995).

changes secondary to hypertension.  (Tr. 179).  Dr. Daniel Harper determined that Plaintiff

had hypertension and non-acute congestive heart failure.  *Id.*

The same day Plaintiff was examined by Dr. Albert Klemptner.  (Tr. 176-77).  Dr.

Klemptner concluded that Plaintiff had hypertension, renal insufficiency, seasonal allergic

rhinitis, and degenerative joint disease.  (Tr. 177).  Dr. Klemptner prescribed Tylenol for

Plaintiff's degenerative joint disease.  *Id.*  Plaintiff was released from the hospital three days

later with a prescription for Cardizem.  (Tr. 175).

On June 21, 2004 Plaintiff was seen by Dr. Leonidas Rohas for a disability

examination.  (Tr. 157-58).  Plaintiff reported that he began experiencing problems in 1998

after he injured his left ribs and lung.  According to Plaintiff, he had pain on the left side of

the thorax since his accident, which was aggravated by breathing or changing positions.  (Tr.

156).  Plaintiff also reported that he had difficulty breathing and became lightheaded with

exertional activity, such as walking for two blocks.  *Id.*  Plaintiff stated that he took

Atrovent, Flovent, and an Albuterol inhaler for his pulmonary problems, which provided

some benefit.  *Id.*

Plaintiff further told Dr. Rohas that for the past four months he had pain in his left

hip that radiated down his left leg, knee, and foot, which was worsened by prolonged

standing, walking, bending, or significant lifting.  No x-rays had been taken to determine the

origin of this pain.  Plaintiff indicated that he used a cane when walking because of the pain

and that he took Tylenol and Naprosyn which provided some relief.  *Id.*

Plaintiff also reported that he had a long history of hypertension, which caused headaches. He told Dr. Rohas that had been prescribed Zestril, Lasix, and Tenormin for this condition and that he also took Lipitor to treat his high cholesterol. *Id.*

In reviewing Plaintiff's social history, Plaintiff reported that he had moved to the United States from Yemen in 1976 and that he quit school in the sixth grade. He worked for 18 years as a welder and for 4 years as a machine operator but was no longer working due to his chest and lung problems. Plaintiff stated that his wife and children remained in Yemen and that he lived with one of his brothers. Plaintiff told Dr. Rohas that he was able to take care of his own personal needs and that he did some driving. (Tr. 157).

Upon physical examination, Dr. Rohas noted that Plaintiff was obese and that he had mild difficulty getting on and off of the examination table. (Tr. 157). An examination of Plaintiff's chest showed no gross deformities or tenderness but there was moderate tenderness at the site of Plaintiff's old left thoracotomy surgical scar. Plaintiff's lungs were clear but he had shallow respirations. Plaintiff experienced thoracic pain upon deep inspiration, which also produced a dry cough. Minimal wheezing and bilateral rhonchi were noted. *Id.* As to Plaintiff's upper extremities, he had 5/5 grip strength bilaterally and was able to perform fine and gross manipulation. (Tr. 158). Dr. Rohas also noted that Plaintiff's affect was "somewhat flat." *Id.*

An examination of Plaintiff's lumbar spine showed that it was in good alignment but slightly tender. A straight leg raising test was 80 degrees on the right and 70 degrees on the

left.  Plaintiff demonstrated 70 degrees of forward flexion, 25 degrees of dorsiflexion, 20

degrees of right lateral flexion, and 10 degrees of left lateral flexion.  *Id.*  Plaintiff had

moderate difficulty with squatting due to lower back and left side chest pain.  His gait was

guarded but he was able to walk without an assistive device.  However, Plaintiff did have

marked difficulty walking tandem on his heels and toes.  Plaintiff also had a mild to

moderate decrease in touch, pin prick, and vibratory sensation and mild to moderate left leg

weakness.  Tendon reflexes were 1+ bilaterally.  (Tr. 157-58).

Dr. Rohas also completed pulmonary function tests.  (Tr. 160-61).  Plaintiff had taken

Albuterol prior to testing and therefore only post-broncholdilator testing could be

performed.  (Tr. 160).  Plaintiff complained of chest pain with each procedure and attributed

his inability to blow out longer to his chest pain.  *Id.*  Dr. Rohas noted that Plaintiff's

thoracic pain influenced the pulmonary function test results.  (Tr. 158).

Dr. Rohas concluded that Plaintiff had a history of heavy smoking and thoracic

surgery and that Plaintiff's problems were complicated by chronic bronchitis and surgical

pain.  Dr. Rohas noted that a chest x-ray would be desirable and that Plaintiff needed to

control his hypertension.  He also noted that Plaintiff's report of recent symptoms was

consistent with lumbrosacral disc disease and left-sided radiculopathy, that Plaintiff was

markedly obese, and seemed at least moderately depressed.  (Tr. 158).

On July 6, 2004 Plaintiff's medical records were reviewed by a state agency physician.

(Tr. 162-69).  The physician concluded that Plaintiff could: (1) lift/carry 20 pounds

-5-

occasionally and 10 pounds frequently; (2) stand/walk/sit for about 6 hours in an 8-hour workday; (3) push/pull without limitation; (4) occasionally climb, stoop, kneel, crouch, and crawl; and (5) frequently balance.  (Tr. 163-64).  The physician further concluded that Plaintiff should avoid even moderate exposure to environmental pollutants such as fumes, odors, and dust.  (Tr. 166).

Plaintiff was admitted to the hospital for abdominal and rectal discomfort with rectal bleeding and nausea on July 23, 2004.  (Tr. 183-85).  Plaintiff was also complaining of chronic nasal congestion, a frequent need to clear his throat of phlegm, shortness of breath, and coughing.  (Tr. 183).  Plaintiff was examined by Dr. Abdulhadi Sinan.  (Tr. 185).  Plaintiff's abdomen was soft and distended.  He had pedal edema but no muscle weakness or sensory deficits were noted.  (Tr. 184).   Plaintiff also had prolonged expiration and bilateral wheezing.  *Id.*  A chest x-ray was consistent with post-surgical changes.  *Id.*  Based upon this information and other tests, Dr. Sinan concluded that Plaintiff had lower gastrointestinal bleeding, an upper respiratory tract infection, exacerbation of his chronic obstructive pulmonary disease, allergic rhinitis, hypertension, diabetes mellitus, and acute and chronic renal failure.  *Id.*  Dr. Sinan admitted Plaintiff to the hospital.

Two days later Plaintiff was examined by Dr. Chilakapati Kumar regarding his renal dysfunction.  (Tr. 188-89).  Dr. Kumar noted that Plaintiff had been admitted to the hospital the previous month for a similar problem but had not kept his follow-up appointment.  A CT scan showed that Plaintiff's left kidney was atrophic with staghorn calculus.  (Tr. 189).  Dr.

-6-

Kumar concluded that Plaintiff should be kept on a diabetic diet and that his blood pressure and blood sugar levels should be meticulously monitored.  Further testing was ordered.  *Id.* Plaintiff was also seen by Dr. Ziad Tahawi for complaints of shortness of breath.  (Tr. 191-94).  Dr. Tahawi prescribed various medications, recommended pulmonary function tests, and indicated that he would consider having Plaintiff undergo a sleep test due to possible sleep apnea.  (Tr. 192-93).

Plaintiff was further examined by Dr. Mohammed Arman on July 29, 2004.  (Tr. 186-87).  Dr. Arman concluded that Plaintiff had recurrent hematochezia and that colon cancer, inflammatory bowel disease, and internal hemorrhoids should be ruled out.  He also determined that Plaintiff had chronic obstructive pulmonary disease and renal failure.  Dr. Arman recommended that Plaintiff undergo a colonoscopy because Plaintiff had not followed through with his previous colonoscopy appointment.  (Tr. 187).

E. Michael Lodish, D.O. examined Plaintiff in September 2004 .  Plaintiff reported that he had diabetes, blood in his stool, fatigue, lower back pain, and asthma.  Plaintiff also gave a history of a previous hernia repair.  Dr. Lodish noted that Plaintiff had black, tarry stools but was otherwise "in pretty good shape."  (Tr. 212).  Dr. Lodish recommended that Plaintiff have a colonoscopy.[2]  *Id.*

---

[2]     The record also contains medical reports from Dr. Leila Haddad dated April 2004 through November 2004.  Dr. Haddad treated Plaintiff for various complaints, including back pain, shortness of breath, stomach pain, dizziness, and renal bleeding.  Dr. Haddad generally prescribed medications to treat Plaintiff's conditions or referred Plaintiff to other doctors for further testing and treatment.  (Tr. 195-211).

In November 2004 Plaintiff was seen at the Oakwood Kidney Institute's Education Center for Kidney Disease for education and dietary counseling regarding his stage 4 kidney disease. (Tr. 246). A letter from a nurse at the Oakwood Kidney Institute to Dr. Thavarajah indicated that Plaintiff had been advised to exercise and to maintain a strict blood pressure. Plaintiff indicated that he was willing to try exercise in short episodes throughout the day because he could not endure long exercise periods due to leg pain. *Id.* Plaintiff was also given instructions on a recommended diet and was advised to monitor his blood sugar levels at home. *Id.*

In September 2005 Dr. Waad Dakkak reported that Plaintiff had severe and advanced lung disease, advanced and deteriorating kidney disease, chronic obstructive pulmonary disease, and lumbar radiculopathy. Dr. Dakkak concluded that Plaintiff's health insurance was inadequate to provide him with optimal care for these conditions. (Tr. 213).

In October 2005 Dr. K. Thavarajah wrote a letter to Dr. Dakkak summarizing his treatment of Plaintiff for renal insufficiency. Dr. Thavarajah noted that Plaintiff was found to have elevated BUN and creatinine levels as well as nocturia. Plaintiff also had peripheral neuropathy secondary to diabetes, which had been treated with Neurontin. Plaintiff reported that due to the neuropathy, it was painful to walk and he had intermittent swelling of the legs as well as numbness and tingling of the feet and hands. Plaintiff also had

-8-

shortness of breath upon exertion but no orthopnea or paroxysmal nocturnal dyspnea.[3]  (Tr. 236).

Dr. Thavarahaj reported that he had examined Plaintiff during multiple office visits. During those examinations, Plaintiff's blood pressure had fluctuated.  Dr. Thavarahaj noted that Plaintiff did not take his blood pressure medication regularly and that he did not re-fill his prescription when he ran out of medication.  (Tr. 236).  Dr. Thavarahaj concluded that Plaintiff had advanced age renal insufficiency secondary to diabetic nephropathy and severe peripheral neuropathy.[4]  Dr. Thavarahaj opined that Plaintiff was not medically fit to perform any full time duty.  (Tr. 237).

## IV.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified before the ALJ at the hearing with the assistance of an Arabic

---

[3]    Paroxysmal nocturnal dyspnea is nighttime shortness of breath that occurs suddenly and recurrently. *Dorland's Illustrated Medical Dictionary* 558 (29th ed. 2000). Orthopnea is difficulty breathing when in positions other than upright.  *See Dorland's, supra*, at 514.

[4]    "Diabetic nephropathy" is a disease of the kidneys that commonly accompanies later stages of diabetes mellitus.  *See Dorland's, supra*, at 1187.

Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system . . ..  Known etiologies include complications of other diseases (e.g. diabetic neuropathy . . . .)."  Peripheral neuropathy is defined as "polyneuropathy," which is "neuropathy of several peripheral nerves simultaneously." *Dorland's, supra*, at 1432-33.

interpreter when necessary.  (Tr. 37-38).  Plaintiff was 49 years old at the time of the hearing and he had a sixth grade Yemenese education.  (Tr. 40).  Plaintiff testified that he stopped working his last job because he got laid off.  (Tr. 40-41).  Thereafter, Plaintiff became tired and sick and could not work.  (Tr. 41).  According to Plaintiff, he could no longer work because of back, leg, knee, and kidney pain and because it was difficult to breathe and to walk.  (Tr. 41-42).  Plaintiff told the ALJ that he: (1) could climb a flight of stairs with difficulty; (2) could walk 1/4 of a block; (3) could stand for 10 minutes before needing to sit down; (4) could sit for no more than 1 hour; (5) could lift 4-5 pounds but could not carry that weight across the room; (6) could reach out with his arms; (7) could not stoop, bend, kneel, or squat; (7) could grip or grasp with his hands but not strongly; (8) could button clothes and sign his name; (9) was bothered by hot weather; (10) had poor vision for which he wore glasses; and (11) could drive, which he did about 3 or 4 times per week.  (Tr. 40, 42-44).

Plaintiff further testified that his back, knee, and foot pain was aggravated by walking and sitting and that he lay down on his back to be comfortable.  (Tr. 44).  Plaintiff also used a cane because of his knee and leg pain.  (Tr. 45).  He also told that ALJ that he had anxiety for which he took medication.  However, Plaintiff did not believe that the medication was effective.  (Tr. 44-45).

**B.    The Vocational Expert's Testimony**

Joseph L. Thompson, a rehabilitation counselor, testified as a vocational expert at the hearing.  (Tr. 63-65, 46-48).  Mr. Thompson testified that Plaintiff's past work as a machine

operator was classified as medium, semi-skilled work performed on a heavy-duty basis. Plaintiff's work as a welder was classified as medium, unskilled work performed at the light to medium levels of exertion. Plaintiff had no transferrable skills. (Tr. 47). Mr. Thompson further testified that if Plaintiff's testimony regarding his difficulty with breathing and his need to lie down were credited, then employment for Plaintiff would be precluded. (Tr. 47-48).

## V.   STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where

-11-

substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently.  *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

## VI.   LAW AND ANALYSIS

### A.   Framework for Social Security Disability Determinations

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

> (1)   he was not presently engaged in substantial gainful employment; and
>
> (2)   he suffered from a severe impairment; and
>
> (3)   the impairment met or was medically equal to a "listed impairment;" or
>
> (4)   he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.

### B.   Analysis

The ALJ found Plaintiff functionally capable of performing the full range

of sedentary work with an environmental restriction against respiratory irritants. *See* 20 C.F.R. § 416.967(a). The ALJ then relied exclusively on the medical-vocational guideline ("Grid"), 20 C.F.R., Pt. 404, Subpt. P, App. 2, Table No. 1, Rule 201.18 and Rule 201.19, to determine that Plaintiff was not disabled.

Plaintiff challenges this non-disability determination by arguing that: (1) the ALJ improperly rejected the opinion of his treating physician, Dr. Thavarahaj, that Plaintiff was unable to work; (2) the ALJ's credibility finding was not supported by substantial evidence; (3) the ALJ improperly relied upon the Grid to find him disabled because he had nonexertional limitations; and (4) the ALJ mis-applied the Grid by failing to properly consider Plaintiff's inability to effectively communicate in English, his marginal education, and his age.

### 1.   The Opinion of Dr. Thavarahaj

Plaintiff asserts that the ALJ erroneously rejected Dr. Thavarahaj's opinion that Plaintiff was "not medically fit to perform any full time duty" because, as the ALJ acknowledged, Dr. Thavarahaj's opinion was based upon objective, medical evidence.

As the Sixth Circuit stated in *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997), "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimant's only once." Indeed, 20 C.F.R. § 404.1527(d)(2) provides that a treating source's opinion regarding the nature and severity of a claimant's condition is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence" in the record. However, an ALJ is not bound by a treating physician's opinion if that opinion is not supported by sufficient clinical findings or is otherwise inconsistent with other substantial evidence in the record. *See Walters*, 127 F.3d at 530.

But, if an ALJ rejects a treating physician's opinion on the issues of the nature and severity of a claimant's impairments, he must "give good reasons" for doing so in his written opinion." 20 C.F.R. § 404.1527(d)(2); see also SSR 96-5p. The ALJ need not, however, "give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ." 20 C.F.R. § 404.1527(e)(3). One such issue is "the determination or decision about whether you meet the statutory definition of disability." 20 C.F.R. § 404.1527(e)(1).

In discussing Dr. Thavarajah's opinions, the ALJ noted that he gave some weight to Dr. Thavarajah's opinions based upon laboratory tests from November 2004 through August 2005. The exhibits to which the ALJ referred pertain to various blood and urine testing, which formed the basis of Dr. Thavarajah's opinion that Plaintiff had chronic renal insufficiency secondary to diabetic nephropathy and hypertension.  (Tr. 238-86). However, the ALJ did not accept Dr. Thavarahaj's opinion that, simply based upon these diagnoses, Plaintiff was unable to perform any work. (Tr. 24).

No error occurred as a result of the ALJ's failure to adopt Dr. Thavarajah's opinion that Plaintiff was unable to work. As noted by the ALJ, such an opinion did not concern the nature or severity of Plaintiff's impairments. Rather, it was an opinion on an issue reserved to the Commissioner and was entitled to no "special significance." Furthermore, there was no analysis

-14-

in Dr. Thavarajah's medical report of the Plaintiff's physical limitations or how those physical limitations affected or prevented certain specific types of work activities. For instance, there is nothing in Dr. Thavarajah's report that states that Plaintiff was unable to lift a certain amount, walk a certain distance, or sit due to his medical conditions or that Plaintiff's treatment for his medical conditions would significantly interfere with Plaintiff's ability to work.[5] The only medical source opinion in the record to delineate specific limitations came from the state agency physician who reviewed Plaintiff's medical files and concluded that Plaintiff was capable of performing exertional activities that exceeded those found by the ALJ. The Court also notes that although Dr. Thavarajah reportedly saw Plaintiff on several occasions, the record contains only one of his reports and there are no examination findings within that report that are probative of Plaintiff's physical limitations. (Tr. 236).

### 2.   Plaintiff's Credibility

Plaintiff also attacks the ALJ's determination that he was less than fully credible and therefore rejected Plaintiff's allegation of disabling pain. An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters, at* 531. However, credibility assessments are not insulated from judicial review. Despite deference due,

---

[5]   For example, there is no indication either in Dr. Thavarajah's report or in the record that Plaintiff was undergoing dialysis. Rather, the record reflects that Plaintiff was prescribed various medications, which Plaintiff was not always compliant in taking, and was advised to exercise, follow a special diet, and monitor his blood sugar levels. (Tr. 237, 246).

such a determination must nevertheless be supported by substantial evidence. *Id.* Furthermore, an ALJ's crediblity determination must contain "specific reasons" that are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight". Social Security Ruling ("SSR") 96-7p.

With regard to Plaintiff's allegations of disabling pain, Social Security regulations prescribe a two-step process. The plaintiff must show objective, medical evidence of an underlying medical condition and: (1) objective medical evidence to confirm the severity of the alleged pain rising from the condition; or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. 20 C.F.R. § 404.1529(b) (1995); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 20 C.F.R. § 404.1529(c) (1995); *Jones*, 945 F.2d at 1369-70. In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id.*

The ALJ acknowledged that he was required to consider Plaintiff's subjective complaints

-16-

of disabling pain and cited to the standard for making this determination. (Tr. 23-24). The ALJ

then discussed Plaintiff's testimony regarding the limitations he claimed to suffer as a result of

his medical impairments. (Tr. 24). Thereafter, the ALJ made the following conclusion:

> The undersigned does not find the claimant's allegations that he
> is incapable of all work activity entirely credible due to inconsistencies
> in the record as a whole. The objective medical evidence in the
> record is consistent with the residual functional capacity for
> sedentary work. Although the claimant has described daily activities
> which are fairly limited, two factors weigh against considering these
> allegations to be strong evidence in favor of finding the claimant
> disabled. First, the claimant's alleged limited daily activities cannot be
> objectively verified with any reasonable degree of certainty. Secondly,
> even if the claimant's daily activities are truly as limited as alleged, it is
> difficult to attribute that degree of limitation to the claimant's medical
> condition, as opposed to other reasons, in view of the relatively weak
> medical evidence and other factors discussed in this decision.
> Overall, the claimant's reported limited daily activities are considered
> to be outweighed by the other factors discussed in this decision.

(Tr. 24).

Plaintiff claims that the ALJ's first reason for rejecting his statements as credible was

legally improper because there is no requirement that a claimant provide objective verification

of his or her daily activities. Defendant has not addressed this argument. It is not clear to the

Court what the ALJ meant by "objectively verified." Furthermore, the Court could find no legal

basis for the ALJ's determination that objective proof of a claimant's daily activities is necessary

before an ALJ will credit a claimant's complaint that they are limited. Indeed, such a

requirement would render the submission of claimants' daily activities reports a useless

endeavor. Therefore, the Court concludes that the ALJ relied upon an improper factor in

weighing Plaintiff's credibility. *See Sayles v. Barnhart*, 2004 WL 3008739 *26-27 (N.D. Ill. 2004); *but cf. Shinabarger v. Barnhart*, 2006 WL 3206338 * 14 (S.D. Ind. 2006).

The ALJ also opined that Plaintiff's limitations may not be due to his medical conditions, "as opposed to other reasons." However, he failed to explain this statement. Therefore, this proffered reason for finding Plaintiff less than credible provides no reasoned basis for this Court to uphold the ALJ's credibility determination. The ALJ must adequately explain his rationale in order to permit informed review.

Furthermore, the court notes that the ALJ's decision is based upon various credibility determinations that remained unexplained. Although the ALJ discusses the evidence earlier in his opinion, he provides little discussion connecting such evidence to Plaintiff's claims. The problem in having the lack of a logical bridge between the facts and Plaintiff's claims is highlighted by the partial support found for Plaintiff's claims in the state agency physician's RFC assessment. For example, the state agency physician opined that Plaintiff was limited in his ability to handle and finger and that Plaintiff should not climb ladders, ropes, or scaffolds, which is at least partially consistent with Plaintiff's testimony. (Tr. 25-26). However, the ALJ made no explicit determination as to whether he adopted or rejected the state agency physician's opinions. See SSR 96-6p, 1996 WL 374180, at * 2 (an ALJ "must explain the weight given to the [non-examining physician's] opinions in their decisions. *Id.* The ALJ's determination of Plaintiff's credibility was critical because the VE expressed the view that some of Plaintiff's alleged limitations could preclude or at least impact Plaintiff's ability to work. (Tr. 47-48).

Furthermore, as discussed more fully below, if the ALJ were to determine that Plaintiff had any non-exertional limitations either based upon Plaintiff's subjective claims or upon the report of the state agency physician, the ALJ would need to re-evaluate whether the strict application of the Grid was appropriate.   Therefore, upon remand, the ALJ must re-evaluate Plaintiff's credibility, citing to which of Plaintiff's claims are or are not credited and to the evidentiary basis for his or her conclusions.   The ALJ must also specifically state the extent to which the state agency's physician opinion is accepted or rejected and the reasons supporting this decision.

**3.   The ALJ's RFC Finding and Step Five Determination**

At step five of the sequential analysis, the ALJ subsequently applied Rules 201.18 and 201.19[6] of the Grids,  20 C.F.R., Pt. 404, Subpt. P, App. 2, Table No. 1, Rules 201.18 and 201.19, to conclude that Plaintiff was not disabled during the relevant time period based upon his factual findings that:  (1) Plaintiff had the RFC to perform a full range of sedentary work; (2) Plaintiff's age category was "younger person" (between the age of 45 and 49); (3) Plaintiff had a "marginal

_____

[6]     Rule 201.18 provides that a claimant who is limited to sedentary work, is 45-49 years old, has a limited education or less, but is at least literate and able to communicate in English, and has an unskilled work history is not disabled.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, Rule 201.18.

Rule 201.19 provides that a claimant who is limited to sedentary work, is 45-49 years old, has a limited education or less, and has a skilled or semi-skilled work history with no transferable skills is not disabled.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, rule 201.19.

-19-

education"; and (4) Plaintiff had no transferable skills from any past, relevant work. (Tr. 26-27).

Plaintiff contends that the ALJ improperly relied upon the Grid Rules because he had non-exertional limitations. The Commissioner can meet his burden at the fifth step of his analysis by referring to the Grid, 20 C.F.R. Pt. 404, Subpt. P, App. 2, which dictates a finding of "disabled" or "not disabled" based on the claimant's exertional restrictions, age, education, and prior work experience. *See Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990). But if a claimant has both exertional and nonexertional impairments, the Commissioner is not permitted to rely on the Grid alone to determine whether a disability exists. *See id.* at 1173-74; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e). If a claimant's non-exertional limitations prevent the claimant from doing the full range of work at the designated level, then the Commissioner must come forward with some reliable evidence showing that there remains a significant number of jobs that the claimant can perform, taking into account the claimant's exertional and non-exertional limitations. *See Shelman v. Heckler*, 821 F.2d 316, 321-22 (6th Cir. 1987). Non-exertional impairments are defined as "certain mental, sensory, or skin impairments" or "impairments [which] result solely in postural and manipulative limitations or environmental restrictions." 20 C.F.R. Part 404, Subpt. P, App. 2, Section 200.00(e).

Plaintiff claims that his non-exertional limitations rendered him unable to perform the full range of sedentary work. Plaintiff therefore contends that the strict application of the Grid

to find him disabled was erroneous.  The limitations to which Plaintiff refers are premised upon his subjective complaints and are therefore intertwined with his assertion that the ALJ should have found his subjective complaints credible.  As noted above, the Court has determined that a remand is necessary to allow the ALJ to re-address Plaintiff's credibility.  If the ALJ adopts any non-exertional limitations afer re-assessing Plaintiff's credibility, the ALJ must determine whether the strict application of the Grid remains appropriate.

The Court further notes that the ALJ determined that Plaintiff was capable of a full range of sedentary work with an environmental restriction against respiratory irritants. (Tr. 26).  As previously noted, environmental restrictions are non-exertional limitations.  Nevertheless, the ALJ made no finding as to whether Plaintiff's environmental restriction significantly impacted Plaintiff's ability to perform a full range of sedentary work.  If such an impact is present to a significant degree, the strict application of the Grid Rules would not be appropriate.  *See Shelman v. Heckler,* 821 F.2d 316, 322 (6th Cir. 1987); SSR 83-14, 1983 WL 31254 (noting that environmental restrictions are non-exertional and may affect a claimant's ability to perform a full range of work).  Therefore, upon remand, the ALJ must specify a factual determination as to what impact, if any,  Plaintiff's environmental restrictions have on Plaintiff's ability to perform the full range of sedentary work, and if such impact renders the application of the Grid rules inappropriate.

As noted previously, the case is being remanded so that the ALJ may specify his or her findings as to the state agency physician's assessment of Plaintiff's RFC.  If the ALJ adopts any

further non-exertional limitations in light of the physician's assessment, the ALJ must similarly make a determination as to what impact, if any, Plaintiff's environmental restrictions place upon Plaintiff's ability to perform the full range of sedentary work and if such impact renders the application of the Grid rules inappropriate.

Plaintiff further contends that the ALJ committed error by mechanically applying the "younger individual" category under the Grid Rules because he was approximately 6 months away from turning 50 years old. If Plaintiff had been 50 years old, the Grid would direct a finding of "disabled" under the person "closely approaching advanced age" category (ages 50-54). *See* 20 C.F.R. Part 404, Subpt. P, App. 2, Rules 201.09 and 201.10.

In general, "the claimant's age as of the time of the [ALJ's] decision governs in applying the regulations." *Varley*, 820 F.2d at 780. The Sixth Circuit has noted that "[t]he fact that age categories are not to be applied mechanically . . . obviously does not mean that a claimant must be moved automatically to the next age category whenever his chronological age is close to that category. *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 622 (6th Cir. 1987). Because Plaintiff has advanced no reason why the ALJ should have moved him to the next age category other than that he was almost 50 when the ALJ rendered his written decision, the Court rejects Plaintiff's argument.

Plaintiff further claims that the ALJ erred in determining that he had a "marginal education" rather than being "illiterate". He also contends that the ALJ erred in finding that he can "communicate" in English. The ALJ's determination of Plaintiff's educational level and

-22-

ability to communicate is critical. The regulations provide that an individual of Plaintiff's age who is limited to unskilled, sedentary work and who is incapable of performing his past, relevant work is disabled if that individual is "unable to communicate in English, or [is] able to speak and understand English but [is] unable to read or write in English." 20 C.F.R. Part 404, Subpt. P, App. 2, § 201.00(h)(1); *see also* Rules 201.17 and 201.18.

The ALJ determined that Plaintiff was marginally educated rather than illiterate. A person with a marginal education generally has abilities in reasoning, arithmetic, and language skills which are needed to perform simple, unskilled types of jobs. The Commissioner considers formal schooling at a sixth grade level or less to be a marginal education. 20 C.F.R. § 404.1564(b)(2). A person who is illiterate, on the other hand, is deemed unable to read or write in English. A person is considered illiterate if the person cannot read or write a simple message (such as instructions or inventory lists), even though the person can sign his or her name. Generally, an illiterate person has little or no formal schooling. 20 C.F.R. § 404.1564(b)(1), (b)(5), (b)(6); *see Chavez v. Dept. of Health & Human Srvs.*, 103 F.3d 849, 852 (9th Cir. 1996). Nevertheless, the regulations caution that "the numerical grade level that [a claimant] completed in school may not represent [his or her] actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it, we will use [the claimant's] numerical grade level to determine [his or her] educational abilities." 20 C.F.R. § 404.1564(b).

-23-

The ALJ's determination that Plaintiff had a "marginal" education was made without discussion and was presumably based upon Plaintiff's testimony that he had sixth grade education. However, there was evidence in the record suggesting that Plaintiff's sixth grade education did not accurately portray Plaintiff's ability to read and write in English. Specifically, although Plaintiff received his 6 years of education in Yemen, the ALJ never made any inquiry as to whether Plaintiff's foreign education conferred upon him any ability to read and write in English. Furthermore, while it is possible that Plaintiff's prior work experience may have taught him sufficient English reading and writing skills to meet the statutory definition of "minimal education", the ALJ made no inquires to support such conclusion.

There was also contradictory evidence in the record which the ALJ was required to clarify, consider, and weigh when evaluating Plaintiff's literacy. Plaintiff claimed on his disability report form that he could not read English but could write more than his name in English. How much more is unknown. There is also evidence that Plaintiff completed his disability forms although it is not known if these forms were read to him. The record contains evidence that Plaintiff had a Michigan's driver's license but it is unknown if Plaintiff took a test in English to secure it. There is also a notation made in one medical report which stated that it was unclear if Plaintiff was able to comprehend written material. (Tr. 40, 70, 82-91, 102-09, 246).

It was the duty of the ALJ in the first instance to gather the facts, examine them, and draw any reasonable conclusions from them to support his or her stated findings regarding

-24-

Plaintiff's literacy so that this Court may conduct a meaningful review. *See Ivy v. Sec'y of Health & Human Servs.*, 976 F.2d 288, 289 (6th Cir. 1992) (a reviewing court "should not be left to guess as to the . . . reasons for granting or denying relief."). The ALJ did not undertake that duty here.

Moreover, a claimant's ability to communicate (i.e., ability to speak and understand English) must be considered when determining what work an individual can perform notwithstanding his or her educational level. 20 C.F.R. § 404.1564(b)(5). The ALJ's written opinion contains no discussion whatsoever concerning Plaintiff's ability to speak and understand the English language. Plaintiff reported that he could not speak English and Plaintiff was assisted by an Arabic translator at the hearing. (Tr. 37-45, 82). Defendant acknowledges that an interpreter was used at the hearing but asserts that the ALJ could have reasonably determined that Plaintiff was able to communicate in English because there were portions of the hearing in which Plaintiff was able to understand the ALJ's questioning without translation and to respond in English.[7] Again, it was the duty of the ALJ in the first instance to make a reasoned decision regarding Plaintiff's ability to communicate in English.

Therefore, if the application of the Grid upon remand is otherwise warranted, the ALJ will re-assess Plaintiff's educational status and ability to communicate in English by conducting

---

[7]      Defendant points to 20 C.F.R. Part 404, Subpt. P, App. 2, § 201.00(h)(4)(i), which recognizes that the ability to communicate in English has very little effect on the sedentary, unskilled job base. However, this section references younger individuals who are ages 18-44 and is therefore not applicable to Plaintiff.

further factual findings regarding Plaintiff's ability to read, write, speak, and understand English and by specifically articulating his or her conclusions regarding these issues.

## VII.  <u>RECOMMENDATION</u>

The Court recommends that Defendant's Motion for Summary Judgment be **DENIED.**  The Court also recommends that Plaintiff's Motion of Summary Judgment be **DENIED** that the case be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)[8] in a manner consistent with this Report.

## VIII.  <u>NOTICE TO PARTIES</u>

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir.

---

[8]     "[S]entence four of § 405(g) contemplates the type of remand involved in the present case-a remand after a final decision by the district court reversing the denial of benefits by the Secretary in order to correct an error by the Secretary in applying the regulations even if the rehearing to correct the error requires the taking of additional evidence.  *Sullivan v. Finkelstein*, 496 U.S. 617, 625-26, 110 S.Ct. 2658, 2664, 110 L.Ed.2d 563 (1990) (sentence four provides appropriate relief when evidence on record is insufficient to support the Secretary's conclusions and further factfinding is necessary)."  *Faucher v. Sec. of Health and Human Services*, 17 F.3d 171, 174 (6th Cir.1994)

1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 19, 2007                    s/ Mona K. Majzoub
                                         **MONA K. MAJZOUB**
                                         **UNITED STATES MAGISTRATE JUDGE**


<u>PROOF OF SERVICE</u>

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date

Dated: March 19, 2007                    s/ Lisa C. Bartlett
                                         Courtroom Deputy

-27-